J-A27044-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| M.J., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| S.J., | |
| Appellant | No. 637 WDA 2014 |

Appeal from the Order entered March 26, 2014,
in the Court of Common Pleas of Allegheny County,
Civil Division, at No(s): FD 07-009307-004

BEFORE:   FORD ELLIOTT, P.J.E., SHOGAN and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:               **FILED NOVEMBER 21, 2014**

S.J. ("Father"), *pro se*, appeals from the Order awarding sole legal custody of the minor child, Su.J. ("Child") to Child's mother, M.J. ("Mother"). We affirm.

The trial court set forth the factual background and procedural history of this appeal as follows:

> Father and Mother were married on February 5, 1994[,] and had two children — Sa.J. (DOB 8/11/94) and Su.J. (DOB 10/9/00).  Mother filed [a Complaint] for divorce in December 2007, with claims for custody, support and equitable distribution. Since then, the docket in this matter has been extremely active. In recent years, the litigation has centered most heavily around Su.J.; Sa.J. has been emancipated for some time.  The primary issue in this latest appeal is legal custody.  The roots of this specific matter date back 18 months.
>
> In September 2012, Mother filed a [P]etition for modification of the parties' custody [O]rder.  It was here where Mother first averred that Father was impeding her efforts to get Su.J. counseling.  That matter was set before [] Hearing Officer [Laura Valles ("Hearing Officer Valles")], who heard the

[P]etition in late November 2012. In early December 2012, []
Hearing Officer [Valles] ruled, among other things, that the
parents should enroll Su.J. in therapy. *See* Report and
Recommendation, dated December 4, 2012.

Both parties filed exceptions. One of Mother's exceptions
was that Father must be required to give the requisite medical
consent to the therapist so that Su.J. could begin treatment. But
before [the trial court] could rule on that exception, Father gave
his consent[,] and so Mother withdrew her contention. *See*
Order of Court, dated March 21, 2013, at Paragraph 4.
Following the exceptions argument, however, Father revoked his
consent and Su.J. was forced to cease her treatment. When
Mother brought the issue before the [trial court], the [c]ourt *sua
sponte* ordered a hearing on legal custody. *See* Order of Court,
dated March 28, 2013. Father appealed [the trial court's]
scheduling of the legal custody hearing. That appeal was
docketed as 723 WDA 2013.

In the interim, Father and Mother each appealed other
unrelated matters. *See* 747 & 925 WDA 2013. In August 2013,
Mother retained counsel, and soon thereafter asked the [trial
court] to cancel the legal custody hearing after coming to an
apparent resolution with Father. *See* Order of Court, dated
August 2, 2013. The armistice was short-lived, however, and
Mother petitioned the [trial court] to schedule a hearing on legal
custody after all. *See* Order of Court, dated September 10,
2013. The legal custody hearing was scheduled for December 5,
2013.

At this juncture, the procedural history devolves from the
complicated to the complex. [The trial court] discontinued the
legal custody portion of the December 5[, 2013] trial, after
Mother presented her case[,] when Father questioned whether
the [c]ourt had jurisdiction to hear the legal custody matter.[1]
On December 11, 2013, six days after the discontinued trial, the
Superior Court affirmed [the trial court's] *sua sponte* scheduling
of the legal custody [O]rder. As it happened, the parties were
before [the trial court] on December 12, 2013[,] for a [M]otion
relating to a tennis tournament, whereby [the trial court]
provided the parties a copy of the Superior Court decision. The
[trial c]ourt asked the parties for potential dates so that the legal
custody portion of the trial could be re[-]scheduled in a timely
fashion. [The trial court] indicated right then that the earliest

date available was January 28, 2014, otherwise the hearing would have to wait until March 13, 2014. Father indicated that he would not be available on the January date.

_____

[1] The trial on December 5, 2013 was a consolidated one: the [trial court] was to hear matters of contempt of a custody [O]rder and legal custody. After discontinuing the legal custody portion. the [trial court] transitioned directly to the contempt portion of the trial. Father consequently [*sic*] appealed the [trial c]ourt's decision not finding Mother in contempt. **See** [Trial Court] Opinion, 117 WDA 2014, dated February 19, 2014, at page 4. [This Court affirmed the trial court's decision not finding Mother in contempt. **See S.J. v. M.J.**, 117 WDA 2014 (Pa. Super. filed September 30, 2014)]

_____

[The trial court] generated two [O]rders on December 19, 2013. The first [O]rder was its ruling from the other half of the December 5[, 2013] trial, which found that Mother was not in contempt of the custody [O]rder. The second [O]rder re[-]scheduled the legal custody hearing for March 13, 2014. Only after it issued those two [O]rders did [the trial court] learn that on December 18, 2013[,] Father filed with the Superior Court an application for re-argument regarding the 723 WDA 2013 appeal (and thus the *sua sponte* scheduling issue).

On January 22, 2014, Father appealed the December 19, 2013 [O]rder, which found that Mother was not in contempt.[2] Critically, Father *did not* appeal [the trial court's] re[-]scheduling of the legal custody hearing for March 13, 2014.

On February 19, 2014 the [trial court] filed its 117 WDA 2014 [O]pinion. With the new legal custody hearing approaching, the [trial court] issued a clarifying [O]rder on February 27, 2014. The [O]rder provided that the hearing will be *de novo*, and that each party has leave to submit an updated pre-trial statement.[3] The [O]rder also provided that the parties must make Su.J. available in the event of an *in camera* interview. Unbeknownst to [the trial court], Father, the day before on February 26, 2014, filed with the [Pennsylvania] Supreme Court a Petition for Allowance of Appeal.[4] Among the contentions Father raised in his Petition for Allowance, not one of them concerned the *sua sponte* scheduling of the legal custody

hearing all the way back in March 2013. On March 13, 2014, [the trial court] proceeded with the legal custody hearing.

_____

[2] **See** 117 WDA 2014.

[3] Both parties declined.

[4] **See** 101 WAL 2014.

Trial Court Opinion, 5/28/14, at 1-4 (footnotes and emphasis in original).

At the legal custody hearing on March 13, 2014, Mother, who was represented by counsel, testified on her own behalf, and was subject to cross-examination by Father, who was not represented by counsel. The trial court also questioned Mother, but opted not to question Child. N.T., 3/13/14, at 81-90, 129.

On March 26, 2014, the trial court entered an Order ("Legal Custody Order") awarding Mother sole legal custody of Child, subject to certain enumerated provisions. Trial Court Order, 3/26/14, at 1. On that same date, the trial court separately entered its Findings of Fact. **See** Findings of Fact, 3/26/14.

On April 21, 2014, Father filed a Notice of Appeal of the Legal Custody Order, as well as a Statement of Errors, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). In his brief on appeal, Father raises thirty-six issues numbered 1, 2, 3, 4, 5, 6, 7, 8, 8Aa (Health), 8Ab, 8Ac, 8Ad, 8Ae, 8Ba (Extra-curricular Activities), 8Bb, 8Bc, 8Ca (Educational Matters), 8Cb, 9, 9.1., 9.2, 9.5, 9.6,

9.7, 9.8, 9.8a, 9.8b, 9.8c, 9.8d, 9.8e, 9.9, 9.10, 9.12, 9.13, 9.14, and 9.15.[1] Father's Brief at 7-11.

In any appeal before this Court, our appellate rules must be followed. Where the defects in an appellate brief are substantial, the appeal may be quashed or dismissed. **See** Pa.R.A.P. 2101. In an appellate brief, "[t]he argument shall be divided into as many parts as there are questions to be argued . . . followed by such discussion and citation of authorities as are deemed pertinent." Pa.R.A.P. 2119(a). In addition, the "[c]itations of authorities must set forth the principle for which they are cited." Pa.R.A.P. 2119(c). "If reference is made to the pleadings, evidence, charge, opinion or order, or any other matter appearing in the record, the argument must set forth, in immediate connection therewith, or in a footnote thereto, a reference to the place in the record where the matter referred to appears...." Pa.R.A.P. 2119(b). "Appellate arguments which fail to adhere to these rules may be considered waived, and arguments which are not appropriately developed are waived. Arguments not appropriately developed include those where the party has failed to cite any authority in support of a contention." **Lackner v. Glosser**, 892 A.2d 21, 29-30 (Pa. Super. 2006) (citations omitted); **see also In re W.H.**, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) (stating, "where an appellate brief fails to provide any discussion of a claim

---

[1] Father raised all of these issues in his Statement of Errors.

with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.").

In the Argument section of Father's appellate brief, he fails to set forth any discussion with citation to legal authorities to support his contentions of error raised in issues 1, 4, 5, 8, 8Ab, 8Ac, 8Ad, 8Ae, 8Bb, 8Ca, 8Cb, 9, 9.1, 9.2, 9.5, 9.6, 9.7, 9.8, 9.8a, 9.8b, 9.8c, 9.8d, 9.8e, 9.9, 9.10, 9.12, and 9.14. Thus, he has waived those twenty-seven issues. *See In re W.H.*, 25 A.3d at 339 n.3; *see also Lackner*, 892 A.2d at 29-30.

In custody cases, our standard of review is as follows:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*C.R.F. v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted).

> The discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

***Ketterer v. Seifert***, 902 A.2d 533, 540 (Pa. Super. 2006) (quoting

***Jackson v. Beck***, 858 A.2d 1250, 1254 (Pa. Super. 2004)).

As the legal custody hearing in this matter was held in March 2014, the Child Custody Act ("the Act"), 23 Pa.C.S.A. §§ 5321 to 5340, is applicable. ***See C.R.F.***, 45 A.3d at 445 (holding that, if the custody evidentiary proceeding commences on or after the effective date of the Act, *i.e.*, January 24, 2011, the provisions of the Act apply). In any custody case decided under the Act, the paramount concern is the best interests of the child. ***See*** 23 Pa.C.S.A. §§ 5328, 5338. Section 5338 of the Act provides that, upon petition, a trial court may modify a custody order if it serves the best interests of the child. ***See*** 23 Pa.C.S.A. § 5338.

Section 5328(a) of the Act sets forth the best interests factors that the trial court must consider when determining custody:

> **(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
>
> (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.
>
> (2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).[2]

Following its consideration of the section 5328(a) factors, the trial court may award the following types of custody:

**(a) Types of award.**—After considering the factors set forth in section 5328 (relating to factors to consider when awarding custody), the court may award any of the following types of custody if it in the best interest of the child:

(1) Shared physical custody.

(2) Primary physical custody.

(3) Partial physical custody.

(4) Sole physical custody.

(5) Supervised physical custody.

(6) Shared legal custody.

(7) Sole legal custody.

23 Pa.C.S.A. § 5323(a).

We now address Father's remaining claims. In his discussion of issues 2 and 3, Father cites **Commonwealth ex rel. Levy v. Levy**, 361 A.2d 781 (Pa. Super. 1976), and **Billhime v. Billhime**, 952 A.2d 1174 (Pa. Super. 2008), as cases involving partiality, prejudice, bias or ill-will on the part of the trial court judge, to support his contention that the trial court has exhibited bias in favor of Mother. **See** Father's Brief at 18, 20. These cases,

---

[2] Effective January 1, 2014, the Act was amended to include an additional factor at section 5328(a)(2.1) (providing for consideration of child abuse and involvement with child protective services).

however, did not involve such a finding. Thus, Father has failed to support issues 2 and 3 with applicable case law. **See In re W.H.**, 25 A.3d at 339 n.3; **see also Lackner**, 892 A.2d at 29-30.[3]

In issue 6, Father contends that the trial court abused its discretion by granting sole legal custody to Mother, ignoring that Mother had admitted, *inter alia*, physically abusing and torturing Child, as well as her failures to follow shared legal custody arrangements, ensure Child's homework was done, notice that Child needed vision testing, allow Child to be involved in extracurricular activities, and purchase essential items for Child (ipad, wi-fi services, school supplies, school lunch). Father's Brief at 22-23. Initially, we note that Father fails to discuss the section 5328(a) best interests factors or relate them to his argument. **See id**. Although Father cites five cases in support of his argument, each case that he cites pre-dates the Act. **Id**. at 22, 24. Moreover, Father failed to develop any argument relating those cases to the facts of the present case. **See** Pa.R.A.P. 2119(a). Thus, he has waived issue 6. **See In re W.H.**, 25 A.3d at 339 n.3; **see also Lackner**, 892 A.2d at 29-30.

In issue 7, Father cites **Murphy v. Hatless**, 504 A.2d 917, 920 (Pa. Super. 1986), for the proposition that an "appellate court is bound to interfere with the trial court's determination if the [Legal C]ustody [O]rder is

---

[3] Father also cites **Livingston v. Llando**, 32 Pa. D. & C.4th 182 (Allegheny County 1996) in support of issue 3. Father's Brief at 19. However, we are not bound to follow decisions of the court of common pleas.

manifestly unreasonable as shown by the evidence of record." Father's Brief at 24. We find Father has waived issue 7 by failing to include a citation that supports his contention, *i.e.*, that the trial court has hostility, ill-will, and prejudice against him, and to support that issue with discussion. **See** Pa.R.A.P. 2119(a); **see also In re W.H.**, 25 A.3d at 339 n.3; **Lackner**, 892 A.2d at 29-30. Father has also failed to provide any references to the place(s) in the record where the matters referred to appear, in violation of Pa.R.A.P. 2119(c).

In issue 8Aa, Father argues that the trial court ignored evidence that Mother has failed to tend to Child's medical needs, particularly Child's vision. Father's Brief at 26. Father also asserts that Mother failed to have experts testify as to the mental health of Child, and erred by assuming that Child was seeing the school counselor because of lack of access to a mental therapist. **Id**. at 25. Father cites **Ashford v. Ashford**, 576 A.2d 1076 (Pa. Super. 1990), for the proposition that the trial court should have granted a continuance so that the court could hear testimony from medical experts and obtain a better sense of the credibility of the witnesses. Father's Brief at 27.

Our review of the transcript of the March 13, 2014 hearing reveals that Father did not object to Mother's failure to present medical experts regarding Child's mental health and vision, and failed to request a continuance so that medical expert testimony could be presented to the trial

court.[4]  When a party fails to object in the trial court, he waives the issue on appeal.  **See E.D. v. M.P.**, 33 A.3d at 73, 80 (Pa. Super. 2011); **see also** Pa.R.A.P. 302.  Thus, we conclude that Father failed to preserve this issue for this Court's review by raising the appropriate objection and seeking a continuance at the custody hearing on March 13, 2014.

In issues 8Ba and 8Bc, Father argues that the trial court failed to consider evidence of Mother's refusal to allow Child to participate in numerous extracurricular activities.  Father's Brief at 27.  Father again cites **Murphy** in arguing that this Court should interfere with the Legal Custody Order because it is manifestly unreasonable.  **Id.** at 28.  However, Father failed to include any citations to authority and related discussion that supports his contentions.  **See** Pa.R.A.P. 2119(a); **see also In re W.H.**, 25 A.3d at 339 n.3; **see also Lackner**, 892 A.2d at 29-30.  Father has also failed to provide any references to the places in the record where the matters referred to appear, in violation of Pa.R.A.P. 2119(c).  **See** Father's Brief at 27 (where Father merely states that "[t]hese are on record with petitions and prior instant transcripts.").  Accordingly, these issues are waived.

In issue 9.13, Father contends that the trial court failed to indicate why certain evidence was not taken into consideration.  Father's Brief at 33.

---

[4] We note that, at the hearing on March 13, 2014, Father raised an objection to the hearing, on the basis that the trial court lacked jurisdiction.  N.T., 3/13/14, at 24.

-12-

Nevertheless, Father claims that the trial court dismissed such evidence as "isolated, stale or *de minimus* and failed to create a record." *Id*. Once again, Father has failed to provide any references to the places in the record where the matters referred to appear, in violation of Pa.R.A.P. 2119(c). *See* Father's Brief at 33 (where Father merely states that the trial court's "response to this has been addressed in other parts of this brief."). Accordingly, this issue is waived.

In issue 9.15, Father contends that the "[trial c]ourt is LYING so [it] can prove it can do whatever it wants." *Id*. at 35 (emphasis in original). Father also claims "Lies, lies, lies … by [the trial c]ourt" and asserts that "the trial court is allowed to misuse and abuse of [*sic*] judicial power to hurt a child on the basis of [the trial court's] demonstrated hostility to [] Father for standing up for his rights as a parent." *Id* at 36. Father cites *E.A.L. v. L.J.W.*, 662 A.2d 1109 (Pa. Super. 1995), for this Court's scope and standard of review. Again, we find Father has waived issue 9.15 by failing to include a citation and related discussion that support his contention that the trial court has hostility, ill-will, and prejudice against him in support of that issue. *See In re W.H.*, 25 A.3d at 339 n.3; *see also Lackner*, 892 A.2d at 29-30.

Similarly, in his Reply Brief, Father complains about the bias of the trial court judge. Father's Reply Brief at 3. Father points to comments that people allegedly have posted to the Internet complaining about the trial

court judge. *See id*.; *see also id*. at Exhibit 1. This matter is not properly before this Court, as such comments are not part of the certified record. *See Commonwealth v. Preston*, 904 A.2d 1, 7 (Pa. Super. 2006) (*en banc*) (stating that any document which is not part of the officially certified record is deemed non-existent, and an appellate court is limited to considering only the materials in the certified record when resolving an issue).[5]

In his Supplemental Reply Brief, Father complains about various Orders that the trial court entered *after* Father lodged this appeal. Father's Supplemental Reply Brief at 1-2; *see also id*. at Exhibits A-F. Father asserts that these Orders relate to matters involving Mother's alleged contempt of the Legal Custody Order, and are evidence of the trial court's bias in favor of Mother. *Id*. at 1-2. These Orders, and the trial court's new rulings on the alleged contempt matters, are not properly before us in our review of the March 24, 2014 Custody Order, even to demonstrate continued bias on the part of the trial court judge, as our review is limited to the certified record. *See Preston*, 904 A.2d at 7.

---

[5] Father also challenges the brief filed by Mother's counsel as inadequate to support the award of sole legal custody to Mother. Father's Reply Brief at 2-3. Father misapprehends the burden in this appeal. As the appellant, it is Father, and not Mother, who bears the burden of demonstrating legal error or abuse of discretion on the part of the trial court. *See Miller v. Miller*, 744 A.2d 778, 788 (Pa. Super. 1999) (stating "[i]t is the Appellant who has the burden of establishing his entitlement to relief by showing that the ruling of the trial court is erroneous under the evidence or the law.").

After a careful review of the record, we conclude that there was ample, sufficient evidence to support the trial court's credibility and weight determinations. **_C.R.F._**, 45 A.3d at 443. Moreover, the trial court's conclusions do not involve an error of law, nor are they unreasonable in light of the sustainable findings of the trial court as shown by the evidence of record. **_Id_**. Accordingly, with regard to the preserved issues, we find no basis upon which to disturb the trial court's well-reasoned Opinion, and affirm on this basis.[6] **_See_** Trial Court Opinion, 5/28/14, at 4-23.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/21/2014

---

[6] The trial court did not separately address section 5328(a)(2) and section 5328(a)(2.1), but acknowledged that Mother had obtained a prior Protection From Abuse ("PFA") Order against Father. **_See_** Trial Court Opinion, 5/28/14, at 19. The trial court explained that it did not factor this PFA Order into its legal custody decision, as the parties did not raise the PFA Order at the March 13, 2014 legal custody hearing or present any evidence pertaining to section 5328(a)(2.1). **_Id_**.

- 15 -

Circulated 11/03/2014 02:52 PM

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
FAMILY DIVISION

M.J.,                               :        **CHILDREN'S FAST TRACK**
                                    :
              Plaintiff,            :        OPINION
                                    :
        v.                          :        No.: FD-07-09307-004
                                    :        637 WDA 2014
S.J.,                               :
                                    :
              Defendant.            :
                                             BY:


                                             Honorable Kathryn Hens-Greco
                                             440 Ross Street
                                             Suite 5077
                                             Pittsburgh, PA 15219


                                             COPIES TO:

                                             Counsel for Plaintiff:

                                             Mark B. Marrow, Esquire
                                             429 Forbes Avenue, Suite 909
                                             Pittsburgh, PA 15219 - 1604


                                             *Pro Se* Defendant:

                                             S. J.
                                             1605 Blackburn Heights Drive
                                             Sewickley, PA 15143

FILED
14 MAY 28 PM 3:06
DEPT. OF COURT RECORDS
CIVIL FAMILY DIVISION
ALLEGHENY COUNTY, PA

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
FAMILY DIVISION

| M.J., | : | **CHILDREN'S FAST TRACK** |
| | : | |
| Plaintiff, | : | No.: FD-07-09307-004 |
| | : | 637 WDA 2014 |
| v. | : | |
| | : | |
| | : | |
| S.J., | : | |
| | : | |
| Defendant. | : | |

OPINION

HENS-GRECO, J.                                                    May 28, 2014

In this matter, S.J. ("Father"), *pro se,* appeals the Court's Order of March 24, 2014,

following a half-day trial on March 13, 2014, which addressed matters of legal custody. This

Court awarded M.J. ("Mother") sole legal custody of the parties' 13-year-old daughter, Su.J. For

the following reasons, Father's appeal is without merit, and this Court's Order should be

affirmed.

## I.     FACTUAL AND PROCEDURAL HISTORY

Father and Mother were married on February 5, 1994 and had two children – Sa.J. (DOB

8/11/94) and Su.J. (DOB 10/9/00). Mother filed for divorce in December 2007, with claims for

custody, support and equitable distribution. Since then, the docket in this matter has been

extremely active. In recent years, the litigation has centered most heavily around Su.J.; Sa. J. has

been emancipated for some time. The primary issue in this latest appeal is legal custody. The

roots of this specific matter date back 18 months.

In September 2012, Mother filed a petition for modification of the parties' custody order.

It was here where Mother first averred that Father was impeding her efforts to get Su.J.

1

counseling. That matter was set before a Hearing Officer, who heard the petition in late November 2012. In early December 2012, the Hearing Officer ruled, among other things, that the parents should enroll Su.J. in therapy. *See* Report and Recommendation, dated December 4, 2012.

Both parties filed exceptions. One of Mother's exceptions was that Father must be required to give the requisite medical consent to the therapist so that Su.J. could begin treatment. But before this Court could rule on that exception, Father gave his consent and so Mother withdrew her contention. *See* Order of Court, dated March 21, 2013, at Paragraph 4. Following the exceptions argument, however, Father revoked his consent and Su.J. was forced to cease her treatment. When Mother brought the issue before the Court, the Court *sua sponte* ordered a hearing on legal custody. *See* Order of Court, dated March 28, 2013. Father appealed this Court's scheduling of the legal custody hearing. That appeal was docketed as 723 WDA 2013.

In the interim, Father and Mother each appealed other unrelated matters. *See* 747 & 925 WDA 2013. In August 2013, Mother retained counsel, and soon thereafter asked the Court to cancel the legal custody hearing after coming to an apparent resolution with Father. *See* Order of Court, dated August 2, 2013. The armistice was short-lived, however, and Mother petitioned the Court to schedule a hearing on legal custody after all. *See* Order of Court, dated September 10, 2013. The legal custody hearing was scheduled for December 5, 2013.

At this juncture, the procedural history devolves from the complicated to the complex. This Court discontinued the legal custody portion of the December 5 trial, after Mother presented her case when Father questioned whether the Court had jurisdiction to hear the legal custody matter.[1] On December 11, 2013, six days after the discontinued trial, the Superior Court

---

[1] The trial on December 5, 2013 was a consolidated one; the Court was to hear matters of contempt of a custody order and legal custody. After discontinuing the legal custody portion, the Court transitioned directly to the

2

affirmed this Court's *sua sponte* scheduling of the legal custody order. As it happened, the parties were before this Court on December 12, 2013 for a motion relating to a tennis tournament, whereby this Court provided the parties a copy of the Superior Court decision. The Court asked the parties for potential dates so that the legal custody portion of the trial could be rescheduled in a timely fashion. This Court indicated right then that the earliest date available was January 28, 2014, otherwise the hearing would have to wait until March 13, 2014. Father indicated that he would not be available on the January date.

This Court generated two orders on December 19, 2013. The first order was its ruling from the other half of the December 5th trial, which found that Mother was not in contempt of the custody order. The second order rescheduled the legal custody hearing for March 13, 2014. Only after it issued those two orders did this Court learn that on December 18, 2013 Father filed with the Superior Court an application for re-argument regarding the 723 WDA 2013 appeal (and thus the *sua sponte* scheduling issue).

On January 22, 2014, Father appealed the December 19, 2013 order, which found that Mother was not in contempt.[2] Critically, Father *did not* appeal this Court's rescheduling of the legal custody hearing for March 13, 2014.

On February 19, 2014 the Court filed its 117 WDA 2014 opinion. With the new legal custody hearing approaching, the Court issued a clarifying order on February 27, 2014. The order provided that the hearing will be *de novo*, and that each party has leave to submit an updated pre-trial statement.[3] The order also provided that the parties must make Su.J. available in the event of an *in camera* interview. Unbeknownst to this Court, Father, the day before on

---

contempt portion of the trial. Father consequently appealed the Court's decision not finding Mother in contempt. *See* this Court's Opinion, 117 WDA 2014, dated February 19, 2014, at page 4.
[2] *See* 117 WDA 2014.
[3] Both parties declined.

3

February 26, 2014, filed with the Supreme Court a Petition for Allowance of Appeal.[4] Among the contentions Father raised in his Petition for Allowance, not one of them concerned the *sua sponte* scheduling of the legal custody hearing all the way back in March 2013. On March 13, 2014, this Court proceeded with the legal custody hearing.

## II.    DICUSSION

In his "Notice of Appeal and Statement of Errors on Legal Custody Order and Findings of Fact of March 24, 2014 Children's Fast Track" (hereinafter "Statement of Errors"), Father sets forth nine separate statements, including statements with subparts and even sub-subparts. In addressing these contentions, this Court is able to break down the appeal into three primary areas of concern: A. Jurisdiction; B. Prejudice; C. Legal Custody. The legal custody portion can further be divided between the preliminary question of cooperation and animosity, and the ultimate discussion of the custody factors pursuant to 23 Pa.C.S.A. §5328. *See* Part C-1 and Part C-2 of this section.

### A. Jurisdiction

Father's first contention is that this Court lacked jurisdiction to hold the March 13, 2014 legal custody hearing. *See* Father's Statement of Errors, at ¶1. His reasoning is this: This Court lacked jurisdiction to hold the March 2014 legal custody hearing because, before jurisdiction was returned to the trial court, Father filed with the Superior Court a petition for re-argument, and then, once that petition was denied, he filed with the Supreme Court an Allowance of Appeal. *Id.* Essentially, Father argues that he successfully kept the matter of legal custody outside of the Trial Court's reach by punting it from one appellate court to another. But Father is mistaken.

---

[4] *See* 101 WAL 2014.

4

It is generally the rule that once an appeal is taken, the trial court cannot proceed further. *See* Pa.R.A.P. Rule 1701(a). But in this case, the general rule does not apply. The Pennsylvania Rules of Appellate Procedure provide that the trial court has the authority to "proceed further in any matter in which a non-appealable interlocutory order as been entered, notwithstanding the filing of a notice of appeal or a petition for review of the order." *See* Rule 1701(b)(6). And so the question becomes whether the *sua sponte* scheduling order from which Father originally appealed was a final appealable order.

Case law indicates that this answer is not found in Pa.R.A.P. Rule 341, which typically outlines what kind of order is final and whether it is appealable. Rather, custody orders are subject to their own test. "There are important policy reasons to analyze the finality of custody orders differently from other civil court orders. Child custody orders are treated differently because they have significant, important and immediate impact upon the welfare of child." *G.B. v. M.M.B.*,670 A.2d. 714, 718 (Pa. Super. 1996). "An independently asserted claim for custody" – that is, a claim not brought as a count in a divorce action – "would become final after the trial court decided the ultimate issue relating to custody." *Id.* "A custody order will be considered final and appealable only if it is both: 1) entered after the court has completed its hearings on the merits; and 2) intended by the court to constitute a complete resolution of the custody claims between the parties." *G.B.*, at 720.

The custody order in question was this Court's *sua sponte* scheduling order of March 28, 2013. That order did not speak to any substantive change to custody arrangements, interim or otherwise. It merely set a hearing whereby issues regarding Su.J.'s legal custodian could be definitively addressed. This order was interlocutory and non-appealable. And regardless of whether Father filed a notice of appeal, as he subsequently did in 723 WDA 2013, and regardless

5

of whether he petitioned for review, as he did when he sought re-argument before the Superior Court and as he did when he petitioned for allowance of appeal before the Supreme Court in 101 WAL 2014, this Court has always retained the authority to proceed pursuant to Pa.R.A.P. 1701(b)(6).[5]

In *G.B.*, the Superior Court concluded its bright line holding "will protect the child from the protraction of custody litigation through repetitive appeals while still allowing prompt and comprehensive review of custody determinations." *G.B.*, 670 A.2d. at 720. The rule will also uphold the integrity of the trial court's process in deciding custody matters. *Id.* The Superior Court also noted that a custody proceeding, whether on the trial or appellate level, threatens a child's stability. *Id.* Indeed, this Court articulated as much at the original December 5, 2013 legal custody hearing. As this Court noted in its 117 WDA 2014 opinion – the opinion which addressed Father's appeal from December 5th – the Court was hesitant to discontinue the legal custody hearing for the very reason of stability.

In its 117 WDA 2014 opinion, this Court briefly discussed other reasons why it retained the authority to proceed. For one, the December 5, 2013 legal custody trial stemmed not from the March 28, 2013 *sua sponte* scheduling order, but rather from the September 10, 2013 scheduling order, which Mother sought when the parties' cooperation fell through. *See* Trial Court Opinion, 117 WDA 2014, at 4. Father did not appeal the September 2013 order. Although dubious of Father's last minute objection, this Court nevertheless opted for the more

---

[5] Lest this Court forgets, the Superior Court did address Father's argument that this Court improperly scheduled *sua sponte* the legal custody hearing for December 5, 2013. On December 11, 2013, the Superior Court issued its 723 WDA 2013 decision, which read: "Father also complains about the fact that the trial court ordered a hearing as to whether legal custody should be shared or awarded to one party. However, that aspect of the order does not aggrieve Father since it only ordered a hearing on the issue and did not alter the extant legal custody arrangement." *See* page 12.

6

cautious approach, as opposed pressing ahead full-steam with a potential procedural defect lurking in the background.

And so, after delaying the hearing for a time whereby this Court could ascertain the proper path forward and to ensure that Father was not prejudiced by Mother's false assumption that 723 WDA 2013 had been decided, this Court concluded that it had proper jurisdiction to proceed on March 13, 2014.

## B. Prejudice

On that note, one of the reasons this Court discontinued the December 5, 2013 hearing was so as not to prejudice Father. Flash forward to the latest appeal, Father next argues that this Court, by virtue of holding the March 13, 2014 hearing, "committed prejudice," evidenced "ill-will resulting in prejudice," has "hostility, ill-will and prejudice" toward Father. *See* Statement of Errors, at ¶¶2; 5; 7.

At the March 13, 2014 legal custody hearing, Father adamantly objected that this Court had decided to proceed. At the end of the hearing Father stated: "I didn't come prepared for the hearing, because I didn't expect it to be valid." *See* Transcript of Testimony (hereinafter "T.T."), at 128. This is a feeble excuse. For one, this Court properly had jurisdiction to proceed. Second, Father was not without notice. The issue of legal custody has been before the Court, in one capacity or another, for the past 18 months. After the discontinuance of the December 5, 2013 legal custody portion, Father received first an oral indication that it was going to reschedule the hearing for mid-March. Less than a week later, Father received a written order officially putting the case back on the calendar. Father did not appeal. Father did not present a motion for continuance. Instead, Father had three months to review the December 5, 2013 transcript – that is, three months to review Mother's *prima facie* case for legal custody. Father's misguided

7

assumptions about how the trial would proceed, or more accurately, how it would not proceed, cannot be confused with this Court's supposed prejudice.

Specifically, Father stated this Court abused its discretion by communicating with Mother in one fashion back in August 2013, but with Father in another fashion prior to the March 13, 2014 hearing. *See* Statement of Errors, at ¶2. This statement concerns *ex parte* communication. The Court cannot intelligently respond to this specific contention as all correspondence outside of the courtroom is intercepted by its staff. *See* T.T., at 124. At the March 13, 2014 hearing, Father indicated that he tried to inform via *ex parte* communication the Court that he petitioned for re-argument and then later for an allowance of appeal. *Id.* Perhaps Father was suggesting that the onus was somehow on this Court to provide him legal answers as to how the Court was proceeding. Perhaps not. In any event, this Court has seen years of litigation involving the parties. Father knows quite well what qualifies as *ex parte* communication. And he knows full well how to bring a motion. This Court cautioned Father about procedure as recently as February 19, 2014 when it issued its 117 WDA 2014 opinion. *See* Trial Court Opinion, dated February 19, 2014, at page 5-6.

Next, Father alleges that this Court showed its true prejudicial colors when it "failed to respond to the release of Opinion for 2137 WDA 2008 that is allegedly still on display in Pittsburgh Law Journal publication." *See* Statement of Errors, at ¶5. *See also* ¶7(a). Father alleges "[t]his is evidence of ill-will resulting in prejudice against Father in the issuance of March 24, 2014 order and finding of facts." *Id.* Father seems to accuse this Court of surreptitiously releasing sealed documents for malicious reasons. As evidence, Father notes that he "caught" this Court once already. *Id.* He refers to this Court's previous opinion, where Father

8

alleged that this Court abused its discretion because one of its previous opinions was discovered in the Allegheny County Law Library. *See* this Court's Opinion, 117 WDA 2014, at 13-14.

This Court adopts that discussion:

> In the Family Division of the Allegheny County Court of Common Pleas, it is standard procedure to circulate all written opinions to the Allegheny County Law Library. This is done via email. The opinions are kept in a box undifferentiated by anything other than the author's name. This procedure does not apply, however, when the opinion is from a case with a sealed record. The instant case has a sealed record. Despite precautions already in place, two of this case's many opinions were mistakenly circulated and made it to the box in the law library, where they were discovered by Father. When Father brought the matter to the Court's attention in September 2013, this Court immediately contacted the library and gave instructions to destroy the documents. Additionally, more procedures were instituted to prevent the reoccurrence of the error. This mishap, unfortunate as it may be, has nothing to do with the issues before the Court at the December 5, 2013 trial. In fact, Father already brought this matter to the Superior Court's attention. *See* Father's Motion for Contempt of Court Order by Trial Court with Release of Sealed Documents for Pending Appeals, served to this Court on September 26, 2013.

*Id.* If there is still a bureaucratic breakdown happening, this is the first that this Court has heard about it. Father states that this Court "failed to respond." *See* Statement of Errors, at ¶ 5. Only in preparing this opinion was the Court made aware that another one of its *S.J. v. M.J.* opinions – there are now at least 15 of them - is still allegedly on someone's books. This Court's staff could not locate such an opinion even after inquiring with the Allegheny County Bar Association and the Pittsburgh Legal Journal, whose staff also double-checked to ensure that the opinion in question was not published. Father argues that this Court purposely lets sealed documents slip here and there. This Court does not purposefully release any sealed documents so as to prejudice Father. When he brings such issues to the Court's attention, it does the best that it can to ensure that no part of the record is made public.

9

Finally, Father contends that this Court has evidenced its prejudice against Father by "b) assuming jurisdiction over matters on selective basis when it wants to rule in favor of Mother but denying when favorable to Father, c) providing legal advise (sic) to Plaintiff, d) issuing *ex parte* order not provided to Father, e) canceling hearing not presented in Motions Court as it did in August 2013, f) granting hearing on any petition filed or not filed by Mother denying Father's petitions as *de minimis*; and g) fabricating facts not supported by evidence." *See* Statement of Errors, at ¶7. The jurisdiction contention of Statement ¶7(b) was discussed above.

Per Statement ¶7(c), Father contends that this Court gave Mother legal advice during the March 2014 legal custody hearing. *See* T.T., at 113. What Father refers to is a moment in Mother's testimony where the Court simply asked Mother to clarify whether she sought full legal custody. *Id.*, at 112-113. Father tried to make hay out of Mother's confusion with the question. *Id.*, at 113. As Father would have it, Mother's confusion and subsequent hesitation on the stand is *ipso facto* a falsification under sworn oath, and thus, perjury. The Court thinks differently. This, according to Father, was a prime opportunity for the Court to forgo its impartiality so it could represent the interests of Mother, all of which serves as evidence of this Court insistence that Father not receive a fair trial. *Id.* But that is not the case. As discussed below in Section C-1, Mother has always petitioned the Court for full sole legal custody. Again, Father was simply unprepared.

In terms of Father's Statement of Errors at ¶7(d);(e);(f), the Court knows not what Father refers to in these contentions. The Court surmises that he must take issue with some sort of perceived defect in the procedure, but Father did not make any objections to such issues back in August and September of 2013. Likewise, he did not mention anything of the sort at the March

13, 2014 legal custody hearing. For those reasons, this Court has no choice but to deem these specific contentions waived.

The last element of Father's "prejudice argument" is that this Court fabricated facts not supported by the evidence. *See* Statement of Errors, at ¶7(g). "When the trial court sits as fact finder, the weight to be assigned the testimony of the witnesses is within its exclusive province, as are credibility determinations, and the court is free to choose to believe all, part, or none of the evidence presented." *Mackay v. Mackay*, 984 A.2d. 529, 533 (Pa. Super. 2009) (citations omitted). "The resolution of conflicting testimony is appropriately the purview of the trial court and [the Superior Court] will not reverse absent an abuse of discretion." *Johns v. Cioci*, 865 A.2d. 931, 939 (Pa. Super. 2004)(citation omitted).

As this Court will discuss below in greater detail, the Court arrived at facts and determinations most disagreeable to Father. Naturally, the parties disagreed on a great deal of issues. Much of the litigants' evidence is in the form of their testimony. This is especially true in Father's case. As the above standard indicates, this Court is free to choose to believe all, part or none of the evidence presented. That this Court was persuaded by Mother's testimony is not an abuse of discretion. What is more, a great deal of Mother's testimony was uncontested by Father.

## C. Legal Custody

### 1. Inability to Communicate and Cooperate and a Record of Animosity

The Court now discusses its substantive decision which provoked Father's appeal. Father dedicates five statements of error to the legal custody issue. *See* Statements of Error, at ¶¶ 3-4; ¶6; ¶8; ¶9. Boiled down, Father objects to two aspects of this Court's ruling: a) this Court

11

improperly granted Mother legal custody in areas in which she did not seek, and b) that the evidence did not support a finding for Mother. Here too, Father's contentions are without merit.

For one, it is clear that Mother sought full legal custody. That is, she petitioned the Court for sole decision-making power in all aspects of Su.J.'s life. *See* Mother's Petition to Reschedule Hearing on Legal Custody, dated September 10, 2013, at ¶13; *See also* [Mother's] Pre-Trial Statement Regarding Legal Custody, dated December 2, 2013. To be sure, a principal reason that Mother turned to the courts for recourse was because Father revoked his consent, thereby preventing Su.J. to see a therapist. Su.J.'s mental health, and thus Mother's medical decision-making power, was a chief concern. However, as far as Mother saw it, the stressors that led to the child requesting professional help also had their roots in the child's relationship with her Father. That relationship includes his involvement with Su.J.'s education and her extracurricular life as well.

Granting one parent sole legal custody is something of a rarity in child custody cases. Indeed, case law provides that such an award is likely improper when:

> "1) both parents are 'fit'; 2) both desire continuing involvement with their child; 3) both parents are seen by the child as sources of security and love; 4) both parents are able to communicate and cooperate in promoting the child's best interests."

*See Bernard v. Green*, 602 A.2d. 1380, 1381 (Pa. Super. 1990) (quoting *In re Wesley J.K.* 445 A.2d. 1243, 1249 (Pa. Super. 1982). "The absence in the record of animosity of one parent toward the other strengthens the case for shared custody." *In re Wesley J.K.*, 445 A.2d. 1243, 1249.

In this case, both parents are plainly fit and it is clear that both desire to be involved with the child. Su.J. likely finds her Father to be a source of love, though she might not necessarily find him as a source of emotional security. This Court need not dissect the third element,

12

however, as it is blatantly apparent that Father is unable to communicate and cooperate with Mother in promoting the child's best interests. The record of this case is a record of Father's animosity as much as it is a record of anything.

In 2010 and 2011, Father's conduct has been found to be obdurate, dilatory, and vexatious. *See M.J. v. S.J.*, 29 A.3d 824 (Pa. Super. 2011) (Unpublished memorandum). "In 2012, Father filed three appeals in a criminal action where he unsuccessfully attempted to institute criminal proceedings again Mother and the two attorneys who represented her in the present litigation." *See* Superior Court's Decision and Memorandum, 723 WDA 2013, dated December 11, 2013, at 2-3. Father routinely petitions this Court to sanction Mother or find Mother in contempt of the child custody order, although such "contemptuous" acts are either nonexistent or *de minimis* at best. *See, e.g.*, this Court's Opinions, 117 WDA 2014; 775 WDA 2011. Rarely does a month go by where there is not some kind of movement on the case's docket.

At the legal custody trial, Mother submitted evidence of the parties' inability to communicate and cooperate. She testified that "communication is still extremely broken" and "most of it is pretty hostile." *See* T.T., at 26. In an email, in which the subject line read "MOVE ON," Father advised Mother that she needs to pray for wisdom to move on by being a responsible mother. *See* Mother's Exhibit B-9. Father stated that because Mother dragged the family's surname through "such filth," Su.J.'s chances of becoming the youngest president of the United States have been limited." *Id.* When Mother inquired when Su.J. would return from a visit with Father in Kansas City, Father said Mother "just confirmed [her] lack of basic knowledge of US geography." *See* Exhibit B-8. When Su.J. did not take Father's evening call, Father informed Mother that she was in violation of paragraph 25 of the April 1, 2011 custody

order. *See* Father's Exhibit 1. This animosity is not lost on Su.J. Mother testified that Su.J. knows quite well her Father's feelings toward Mother. She has told her Mother, "boy, Daddy really hates you." *See* Exhibit A, Transcript of Testimony ("T.T.") dated December 5, 2013, at 36-37. The parties' cannot communicate effectively.

While many divorced parents have difficulty communicating, most are able to cooperate enough so as to advance the child's best interests. That is not the case here. The lack of communication has directly led to a lack of cooperation, which has now reached the point where it puts Su.J. at risk. Starting in April 2013, Father began scheduling and taking Su.J. to doctor's appointments without informing Mother, even though Mother is the only parent authorized to schedule the child's visits, per the parties' custody order. As to why Father took it upon himself to do this, Mother believed that Father was searching for a diagnosis so he could say that something was wrong with the child, and that Mother was ignorant of it, and thus Mother is incompetent and unfit. *See* Exhibit A, at 26.

### a) Medical

In April 2013, Mother discovered due to a courtesy call from the doctor's office, that Father had unilaterally scheduled an appointment for Su.J. with a urologist. *Id.*, at 11. The purpose of the visit was to address Su.J.'s frequent urination. Mother canceled that appointment, and scheduled one immediately with Su.J.'s normal pediatrician. *Id.*, at 13. The pediatrician ran some tests, which came back normal. *See* Exhibit B-3. The doctor also scheduled an ultrasound, which also came back normal. *See* Exhibit B-4. However, Father brought up the issue during motions court, where he was there on the unrelated matters of contempt. At that motions day, he also sought primary custody. *See* Father's Motion for Contempt of Custody Order and Primary Custody for Father, dated June 13, 2013. At no time prior to the motion did Father inform

14

Mother that he was dissatisfied with the doctor's results, even though they came back normal. *See* Exhibit A, at 18-19. At the motion, after Father's insistence, Mother, who was unaware that Father was dissatisfied, agreed to take the child to see a pediatric urologist. *See* Order of Court, dated June 12, 2013. The urologist put Su.J. on medication, which led to incontinence. Mother testified that the meds were "making [Su.J.] have bowel movements – really, really, really bad time, like in her pants, while we were out, in the bed." *See* Exhibit A, at 23. Eventually the medication was discontinued. The doctor informed the parties that another urinalysis was normal, that frequent urination is not worry-some and should only be addressed if it is disruptive of her daily activities. *Id.*, at 24. *See also,* Exhibit B-7. In another instance, Father scheduled an eye appointment for Su.J. without Mother's knowledge, even though Su.J. never raised any concern about her eyes with Mother. *Id.*, at 25.

Mother's testimony that Father pushes for these appointments so that he might later accuse Mother of neglect is credible. This Court is inclined to believe the allegation, as Father's course of conduct – that is, the hostility in correspondence and the repeated motions for contempt and primary custody – substantiate Mother's hypothesis. Father's persistence with the urology issue was, at the very least, as motivated by a hope to have something to hold over Mother's head, as it was to ensure Su.J. was healthy.

### b) Mental Health

The parties' inability to communicate and cooperate has adversely affected Su.J.'s best interests in other respects. When Su.J. is around her Mother, she has been "breaking down." *See* T.T., at 26. Mother testified that Su.J. is experiencing a great deal of anxiety, "anguish, tears and crying." *Id.* She acknowledges that Su.J. will put on a face for Father, but when she picks the child up from a visit with him, Su.J. will start wailing, crying and thrashing about. *Id.*, at 26-27.

15

Mother wants Su.J. to have the ability to see a therapist so that she can navigate such anxiety. Mother tries to aid the child as best that she can, knowing that she cannot be the person to broker a relationship between the child and Father. *Id.*, at 89-90. With her Father stonewalling any therapy sessions, Su.J. has resorted to talking with the school's guidance counselor. *Id.*, at 28. However, the guidance counselor cannot serve as a child's individual therapist. *Id.*, at 66.

The first time Su.J. spoke to her Mother about receiving therapy was in 2007 when her older brother Sa.J. received counseling. *Id.*, at 64-65. More recently, Su.J. has sought the help from one of Mother's friends who is a licensed therapist. *Id.*, at 67. Mother's fiancée has also been a resource for Su.J. *Id.*, at 26-27. However, Father has had a history of obstructing Su.J.'s therapy. Mother testified that Father threatened Su.J.'s first therapist in 2011. *Id.*, at 69-70. Mother testified that Su.J. ceased attending sessions with her second therapist because Father convinced her that she was not going to get a job if a record is made of her mental health problems. *Id.*, at 69. Mother testified that Father told Su.J. that her older brother and her Mother were sick and that is why they needed therapy. *Id.* The Court is inclined to believe these allegations. Indeed there is a precedent. Some years ago, Father interfered with Sa.J.'s therapy to such a degree that the therapist stepped off the case. *See* this Court's Opinion, 726 & 727 WDA 2011, dated June 1, 2011, at page 6.

Father stated in his pre-trial statement that Su.J. "is a happy, well-balanced and does not need therapy, and that if the child experiences any stress, it results from Mother's inability to function as a responsible parent." *See* Father's Pre-Trial Statement for Legal Custody and Contempt of Custody Order, dated December 2, 2013, at 2. In fact, the reason that Father revoked his consent regarding Su.J.'s mental health therapy was because the therapist refused to share her written notes and records of the sessions with Father. *See* T.T., at 29; 41; 60. Perhaps

16

Father sought information about the child's mental health. Perhaps Father sought information which he could reference in future litigation. Either way, Su.J. cannot be expected to share her confidential thoughts about her stressful relationship with her Father if her Father can penetrate that confidentiality.

While it is apparent that Su.J.'s anxiety stems from her relationship with her Father, it is important to note that that relationship extends to areas of her life other than her health. Mother testified that Su.J. has trouble coping with the stress she experiences while juggling her extracurricular and academic schedule.

### c) Education and Extracurricular Activities

Mother testified that when Su.J. is with her Father, and she needs something for school, she will call Mother in a panic so as to avoid the stress of asking her Father. *See* T.T., at 47. Similarly she often turns to her Mother so that she does not need to ask her Father to do something. *Id.*, at 80. Father tries to make hay out of the fact that Su.J. received a C in her music class. *Id.*, at 50-51. Su.J. did not turn in her practice sheet, and so she received a lower mark; Su.J. is an otherwise A student. *Id.* Mother considered this to be a good lesson about responsibility. *Id.*, at 76. Father apparently considered this episode to be an example of Mother's contemptuous breach of the custody order in that she failed to ensure that the children completed their homework. *Id.*, at 49.

Su.J. also plays tennis with Father. While Father insists that his superior skill and knowledge of the sport make him the fitter parent on the subject, he seems to miss the point. Mother testified that Father called the child an "embarrassment" at one of her matches. *Id.*, at 101. Father disagreed and considers his input to be "encouragement." *Id.*, at 102. This Court's concern is not whether Mother or Father is involved with the child's social calendar. This

17

Court's believes that Father takes Su.J. to all the activities to which he purports. Rather, the issue is whether Su.J.'s is adversely affected by the techniques and methods of guidance in which Father employs. *Id.*, at 103-104. Mother has submitted enough evidence to persuade the Court that some of these techniques are causing the child a great deal of stress and anxiety.

To be sure, it is highly unlikely that this Court would find a sole legal custodian simply because the parents have different styles of teaching and coaching. The Court might be equally reticent to find a sole legal custodian even if the parties disagreed on a medical treatment decision. This Court is wary of substituting its judgment for the child's parents. However, in this case, where Father's methods have created such a high level of anxiety that a young teenager requests professional help from a therapist, where Father prevents the child from obtaining professional help, and where the Court cannot distinguish which of Father's actions he does out of concern for his child and which actions he does out of animosity toward his ex-spouse, this Court is left with no choice but to award to one parent sole legal custody.

Mother has provided ample evidence of Father's animosity toward her, and his lack of communication and cooperation has adversely affected the child to such a degree where it is no longer in Su.J.'s best interests that the parties share legal custody. Furthermore, it should not be understated that Father also sought sole legal custody. *See* Proposed Legal Custody Order, attached to Father's Pre-Trial Statement for Legal Custody and Contempt of Custody Order, dated December 2, 2013. Thus, it is apparent that Father also feels, as his request indicates, that shared legal custody is no longer appropriate. As such, a finding that one parent be the sole legal custodian is not only warranted, and not only requested by both parties, but also in Su.J.'s best interests.

## 2. Custody Factors

To that end, after reviewing the custody factors outlined in 23 Pa.C.S.A. §5328, this Court finds that it is in Su.J.'s best interests that her Mother is her sole legal guardian. *See* this Court's Findings of Fact, dated March 24, 2014.

The record is clear that Mother is the more likely parent to keep the other involved in the event of a sole legal custody award. *See* 23 Pa.C.S.A. §5328(a)(1). Mother testified that she asked Su.J.'s doctors to call Father and put him on speaker phone while the doctor reviewed the child's medical visits. *See* Exhibit A, at 18-19. *See also* Exhibits B-6 and B-7. Conversely, Father has unilaterally scheduled appointments without discussing his concerns with Mother. Part of the reason, Mother wants the child to have access to a therapist is so she can learn new skills to communicate with Father. *See*, T.T., at 28; 89-90.

Per 23 Pa.C.S.A. §5328(a)(2) this Court acknowledged a past Protection From Abuse order filed by Mother again Father. That issue was discussed in this Court's opinion of 2137 WDA 2008. However, neither party spoke to this issue at the March 13, 2014 legal custody hearing, and the past PFA did not factor into this Court's legal custody decision.

The Court noted that both parties performed parental duties. *See* 23 Pa.C.S.A. §5328(a)(3). However, the Court notes that Mother has been the primary parent who schedules the doctor's appointments. When Father took it upon himself to schedule appointments in April 2013, he did so in violation of the parties' custody order. As far as the other parental duties are concerned, the principal issue is not whether Father performs such duties, but the extent that his methods cause a detrimental level of stress and anxiety. As discussed above, this Court found that he has caused such stress.

Per 23 Pa.C.S.A. §5328(a)(4), and as outlined in this Court's Findings of Fact, dated March 24, 2014, the parties live in close proximity to one another. *See also*, 23 Pa.C.S.A. §5328(a)(11). An award of sole legal custody will also have a stabilizing effect on her education, as the child will no longer be torn about involving her Father. Father takes issue with this Court's fifth finding of fact, per 23 Pa.C.S.A. §5328(a)(5), that Su.J. has access to both sides of her family. Father was silent on this issue at the hearing. But in any event, neither party argued that this factor had a place when determining legal decision-making power.

In this Court's sixth finding of fact, per 23 Pa.C.S.A. §5328(a)(6), it noted the child's relationship with her brother, as well as her brother's past mental health. This is relevant as Mother indicated that, after seeing her brother's success with a therapist, Su.J. thought she might also benefit from professional help. That Father tried to obstruct Sa.J.'s mental health treatment, as discussed at trial and in this Court's past opinion, is indicative that Father has tried to do the same with Su.J.

While this Court chose not to interview, Su.J., it considered what her preference would be based on the testimony of the parties. Father does not appeal this Court's decision to abstain from interviewing the child. In fact, this abstention did not come lightly. Rather, Father, *pro se*, indicated that he would not waive his right to be present during the *in camera* interview. Had the interview taken place, this Court would not be able to adjudicate the veracity of Su.J.'s statements had they been made in the presence of her Father. What is more, Father alleges that this Court abused its discretion by even requesting that Su.J. be available to testify. *See* Statement of Errors, at page 5. Both parents waived their right that the Court interview the child.

Per 23 Pa.C.S.A. §5328(a)(8), this Court heard testimony that Father has let his animosity toward Mother be known to the child. Mother has alleged that Father has tried to disparage

those, including Mother and Su.J.'s brother, who seek therapy or mental health treatment. In his Statement of Errors, Father states that Mother's allegation is a lie, but provided no evidence to support his contention. *See* Statement of Errors, at page 5. Relatedly, per 23 Pa.C.S.A. §5328(a)(9), it is clear that Father does not adequately address Su.J.'s emotional needs. By implying that Su.J.'s future could be tarnished if she has a record of mental health therapy, and by labeling her family as sick, it cannot be said that Father is more likely to address the child's emotional needs. Conversely, Mother has tried to encourage Su.J. to address her issues about her Father directly with her Father.

The Court found, per 23 Pa.C.S.A. §5328(a)(10), that Mother is more likely to attend to Su.J.'s physical, emotional, developmental, and educational needs. Mother does not want to put Su.J. in therapy, so much as she wants Su.J. to have the option of speaking with a professional so that she might learn new skills and coping techniques. *See* T.T., at 28. Court found that Mother sufficiently substantiated her argument that Father had been opportunistically using Su.J.'s potential health issues as evidence that Mother is unfit. Similarly, Father has argued that Mother is unfit because she did not ensure that Su.J. signed her practice music form and because she is not the superior tennis player.

Per 23 Pa.C.S.A. §5328(a)(12), this Court found that Father has actively prevented the child from obtaining mental health treatment. As far as physical child-care arrangements – that is, whom the Father chooses as a babysitter – this factor was not heavily considered when deciding the issue of legal custody.

Per 23 Pa.C.S.A. §5328(a)(13) relating to the willingness and ability of the parties to cooperate with one another, this Court fully outlined such unwillingness and inability in Part C-1 of this opinion. As far as the fourteenth factor is concerned, this Court notes that Mother is a

21

member of Alcoholics Anonymous and that she has received therapy in the past. Father has made no substantiated allegation, besides highlighting those two facts alone, that Mother is an unfit parent. This Court has never heard credible evidence that Mother in unable to parent. *See* 23 Pa.C.S.A. §5328(a)(14). *See also* Findings of Fact, dated March 24, 2014, at page 4.

Finally, this Court noted for the record that Mother will soon be married to her fiancée and that she and her children will be moving in with him. This Court has no concern with the appropriateness of the household. Conversely, Mother has presented credible evidence that Father's home has become one of stress and anxiety for Su.J. It has become a place where she feels a great deal of pressure. *See* 23 Pa.C.S.A. §5328(a)(15).

## III. CONCLUSION

It is clear to this Court that it is no longer in Su.J.'s best interest for her parents to share legal custody. There is an abundance of evidence to support a finding that the parties are unable to communicate and cooperate. There is also a detailed record of animosity such that an award of sole legal custody would be appropriate.

After considering all the relevant custody factors, this Court finds that Mother is the more appropriate parent to be the sole legal custodian. Mother testified that she does not intend to freeze Father out of his parental role, nor prevent him from continuing to enjoy activities with Su.J., nor keep him in the dark regarding her doctor's visits or her education reports. *See* T.T., at 109-112. This Court believes Mother, but in granting Mother her requested relief, it fashioned an order that seeks to discard the ambiguity present in Mother's proposed order. For example, instead of awarding a tie-breaker to Mother when the parents cannot first agree on an extracurricular activity, this Court simply granted Mother the authority to make the final decision right off the bat. Mother has already demonstrated the ability to give Su.J. input when necessary,

but also when to defer to the child's mature decision. Evidence of this is when Su.J. chose to take a world cooking class instead of a film class, despite Mother's strong push for the latter. *Id.*, at 95-96. Su.J. gave her reasons why, demonstrating that she thought through the choice. This Court feels that Su.J. is mature enough to make many of the same decisions regarding her other extracurricular activities. Insofar as mental health and medical decisions go, the record is complete with examples of Mother trying to keep Father abreast, while Father has actively thwarted both Su.J.'s mental health treatment and Mother's involvement. For those reasons, it is necessary Mother be awarded sole legal custody.

Because this Court had the proper authority to proceed with March 13, 2014 legal custody case, and because it conducted said hearing without prejudice toward Father, and for the reasons stated above, this Court's Order of March 13, 2014 awarding Mother sole legal custody should be affirmed.

BY THE COURT:

_____, J.

23